UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TONY MILLER,

               Petitioner,                                   Hon. Robert Holmes Bell

v.                                                 Case No. 1:06-CV-525

CINDI CURTIN,

               Respondent.

_____/


## REPORT AND RECOMMENDATION

       This matter is before the Court on Miller's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Miller's petition be **denied**.


## BACKGROUND

       As a result of events which occurred on January 27, 2004, Petitioner was charged with first degree murder, assault with intent to murder, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm. Several individuals testified at Petitioner's jury trial. The relevant portions of their testimony are summarized below.

1

**Randall Reed**

On the afternoon of January 27, 2004, Reed and Andrew Bell were traveling in Reed's vehicle. (Trial Transcript, May 18, 2004, 32-33). Reed was driving and Bell was sitting in the passenger seat. (Tr. 33). As Reed was driving he noticed a green Taurus "driving real fast and erratically" behind him. (Tr. 34-35). Shortly thereafter, Reed stopped at a stop sign at which point the green Taurus "pulled up" on the driver's side of Reed's vehicle. (Tr. 34-35).

Reed observed that Petitioner was driving the Taurus. (Tr. 34-35, 46-49). Petitioner motioned to Reed to roll down his window. (Tr. 36). When Reed rolled down his window, Petitioner said "that somebody shot up his people's house." (Tr. 36, 49). Before Reed could respond that he did not know what Petitioner was talking about, Petitioner aimed a hand gun at Reed's vehicle and began firing. (Tr. 36-37). Petitioner fired 7-9 times at Reed's vehicle. (Tr. 38-39). Reed was struck in the left elbow and right hand. (Tr. 37-40). Reed looked at Bell, who "wasn't moving or saying anything." (Tr. 39). Reed immediately drove to a local police station, from which he and Bell were taken to a local hospital. (Tr. 40-45).

**Michael Fountain**

As of January 27, 2004, Fountain was employed as police officer with the City of Detroit. (Trial Transcript, May 18, 2004, 86-87). At approximately 2:45 p.m. that afternoon, Officer Fountain was standing outside his precinct building when Randall Reed approached in his vehicle. (Tr. 87-88). Reed was yelling hysterically that he and his friend had been shot at the intersection of Schoolcraft and Ewald Circle. (Tr. 88, 91). Fountain observed several bullet holes on the driver's side of Reed's vehicle. (Tr. 87-88). Reed told Fountain that "he knew the guy" who

shot him, but "couldn't really remember his name."  (Tr. 90).


**Jason Ambabo**

As of January 27, 2004, Ambabo was employed as a City of Detroit police officer. (Trial Transcript, May 18, 2004, 97).  At approximately 2:40 p.m. that afternoon, Ambabo encountered Randall Reed in the police station parking lot.  (Tr. 98).  While helping Reed exit his vehicle, Ambabo observed another man in Reed's vehicle with a gunshot wound to the head.  (Tr. 98-99).  Ambabo then escorted Reed into the police station.  (Tr. 99-100).  Reed told Ambabo that he had been shot by "two guys in a green Taurus."  (Tr. 100-01).


**Roger McGee**

As of January 27, 2004, McGee was employed as a police officer for the City of Detroit.  (Trial Transcript, May 18, 2004, 109).  On that afternoon, McGee and his canine partner were dispatched to investigate a green Taurus located near the intersection of Tyler and Hubbell. (Tr. 109-11).  McGee discovered that the Taurus was locked and located in a "highly contaminated" location.  (Tr. 111).  As a result, McGee's canine partner was unable to obtain a scent "to track from the vehicle."  (Tr. 111).

Shortly thereafter, McGee was dispatched to 12754 Marlowe where Petitioner was being detained by other officers.  (Tr. 111-12).  Using Petitioner as a starting point, McGee and his canine partner began tracking Petitioner's scent.  (Tr. 112-13).  McGee's canine partner tracked Petitioner's scent from the backyard of the residence at 12754 Marlowe to Petitioner's residence at 12875 Hubbell.  (Tr. 113, 124, 133-34).  The green Taurus to which McGee had been initially

dispatched to investigate was located directed across the street from this location. (Tr. 113). McGee also observed a set of footprints that extended from 12754 Marlowe to the side door of Petitioner's residence. (Tr. 114, 133-34).

**Steve Murdock**

As of January 27, 2004, Murdock was employed as a City of Detroit police officer. (Trial Transcript, May 18, 2004, 118). That afternoon, Murdock and his partner, Officer Adam Pembrook, were dispatched to investigate a shooting that occurred at the intersection of Schoolcraft and Ewald Circle. (Tr. 118-19). Murdock and Pembrook were instructed to search for a green Taurus that had been driven by a black male. (Tr. 118-19).

As he was driving in the vicinity of Marlowe and Hubbell, the officers passed a black male who was walking down the street. (Tr. 119-20). Murdock and Pembrook were immediately "flagged down" by a Mr. Floyd who was standing in the driveway of the residence at 12754 Marlowe. (Tr. 120-21). Based on information provided by Mr. Floyd, the officers turned around and "investigated [the] individual [they] had originally passed." (Tr. 122-23). After detaining this man, Murdock called for assistance from another unit. (Tr. 123). As soon as the second unit arrived, Murdock and Pembrook returned to speak with Mr. Floyd. (Tr. 123). After speaking further with Mr. Floyd, Murdock requested that a canine unit be dispatched to his location. (Tr. 123-24).

**Adam Pembrook**

As of January 27, 2004, Pembrook was employed as a police officer for the City of

Detroit. (Trial Transcript, May 18, 2004, 129-30). That afternoon, Pembrook and Officer Murdock were dispatched to the vicinity of Marlowe and Hubbell to investigate a nearby shooting. (Tr. 129-31). As they traveled on Marlowe, Pembrook observed Petitioner walking down the street. (Tr. 130-32). A "few houses down," Pembrook and Murdock were "flagged down" by a man. (Tr. 132). After speaking with this man, Pembrook and Murdock turned around and located Petitioner. (Tr. 132-33). The officers arrested Petitioner and turned him over to another unit that had arrived at the scene. (Tr. 133). Murdock and Pembrook then returned to speak with the man that had flagged them down. (Tr. 133).

**Rick Fields**

As of January 27, 2004, Fields was employed as a City of Detroit police officer, assigned to the evidence technician unit. (Trial Transcript, May 18, 2004, 142). On the afternoon of January 27, 2004, Officer Fields performed a gunshot residue test on Petitioner's right and left hands. (Tr. 146-48).

**William Niarhos**

As of January 27, 2004, Niarhos was employed as a police officer for the City of Detroit. (Trial Transcript, May 18, 2004, 172). At approximately 8:25 p.m. that evening, Officer Niarhos executed a search warrant at Petitioner's residence. (Tr. 133-34, 172-73). Pursuant to this search, Niarhos seized more than 100 pieces of live ammunition from "the hallway floor" and the "top of the couch." (Tr. 173-75). Niarhos also recovered two large bags which contained a substance that appeared to be marijuana. (Tr. 173-75).

**William Steiner**

As of April 14, 2004, Steiner was employed as a forensic chemist for the Detroit Police Crime Lab. (Trial Transcript, May 19, 2004, 5-9). Steiner processed and analyzed the results of the gunshot residue test that Officer Fields performed on Petitioner. (Trial Transcript, May 18, 2004, 146-48; Trial Transcript, May 19, 2004, 8-9). Steiner's analysis revealed the presence of "gunshot residue" on Petitioner's left hand. (Tr. 8-18).

**Dr. Boguslaw Pietak**

As of January 30, 2004, Dr. Pietak was employed as an assistant medical examiner for the Wayne County Medical Examiner's Office. (Trial Transcript, May 19, 2004, 36-38). On this date, Dr. Pietak performed an autopsy on Andrew Bell. (Tr. 38). The doctor determined that Bell died as a result of a single gunshot wound to the head. (Tr. 38-40). Dr. Pietak characterized Bell's killing as a "homicide." (Tr. 40).

**Stipulations**

The parties also stipulated to the following: (1) Petitioner had been previously convicted of a felony; and (2) Petitioner's right to possess a firearm had not been restored. (Trial Transcript, May 19, 2004, 30).

Following the presentation of evidence, the jury found Petitioner guilty of first degree murder, assault with intent to murder, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm. (Trial Transcript, May 20, 2004, 10-11). Petitioner was sentenced to life without the possibility of parole on the murder conviction and lesser terms of

years on the other convictions. (Sentencing Transcript, June 4, 2004, 9-10). Petitioner appealed his

conviction to the Michigan Court of Appeals, asserting the following claims:

I.  Defendant was denied his federal and state constitutional rights to an impartial jury drawn from a fair cross-section of the community and to the effective assistance of counsel, where there was one black person in the array from which his jury was selected.

II.  Defendant was denied a fair trial by the erroneous admission of ammunition and suspected narcotics seized from the Hubbell residence where no direct evidence showed that Defendant possessed drugs, a gun, or ammunition at any time in the house, and Defendant's association with a house wherein drugs and ammunition was found is insufficient to support the prerequisite foundation for their admission.

III.  Defendant was denied his constitutional right to present a defense and to the effective assistance of counsel under the Sixth and Fourteenth Amendments, when his attorney failed to pursue an alibi defense, even though an alibi witness was willing to testify in support of the defense at trial.

IV.  Defendant was denied the effective assistance of counsel, where counsel failed to move to suppress the identification testimony of Randall Reed as the result of an unduly suggestive photo identification, where Reed was shown one photograph prior to the preliminary hearing showing him who would be in the courtroom.

V.  Defendant's convictions must be reversed where the prosecution failed to present sufficient evidence of Mr. Miller's involvement to satisfy the due process standard of guilt beyond a reasonable doubt.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Miller,*

No. 256496, Opinion (Mich. Ct. App., Oct. 18, 2005). Asserting the same claims, Petitioner moved

in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Miller*, No. 129847, Order (Mich., Mar. 27, 2006).  On July 24, 2006, Petitioner initiated the present action, asserting the following claims:

      I.      Petitioner was denied his federal and state constitutional rights to an impartial jury drawn from a fair cross-section of the community where there was one black person in the array from which his jury was selected.

      II.      Petitioner was denied a fair trial by the erroneous admission of ammunition and suspected narcotics from the Hubbell residence where no direct evidence showed that Petitioner possessed drugs, a gun, or ammunition at any time in the house, and Petitioner's association with a house wherein drugs and ammunition was found is insufficient to support the prerequisite foundation for their admission.

      III.      Petitioner was denied the effective assistance of counsel when defense counsel failed to present a defense and failed to present an alibi defense coupled with counsel's failure to file a pretrial motion to suppress the identification testimony of Randall Reed which was the result of a highly suggestive photographic identification when a witness was improperly exposed to a single photograph of Petitioner prior to the preliminary examination.

      IV.      Petitioner's conviction must be reversed where the prosecution failed to present sufficient evidence of Mr. Miller's involvement to satisfy the due process standard of guilt beyond a reasonable doubt.

## <u>STANDARD OF REVIEW</u>

Miller's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect

that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at \*4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state

court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). In such circumstances, the court conducts a *de novo* review. *Id.*; *see also Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.        Jury Selection Claims

Petitioner alleges that the panel from which his jury was selected contained only one African-American. Petitioner asserts that such constitutes a violation of his Sixth Amendment right to a trial by jury, as well as his Fourteenth Amendment right to equal protection of the law.

#### A.        Sixth Amendment

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an

impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. The United States Supreme Court has long held that this right includes the right to be tried by a jury drawn from a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 530 (1975); *Smith v. Berghuis*, 543 F.3d 326, 335 (6th Cir. 2008). Petitioner alleges that his right to be tried by a jury drawn from a fair cross-section of the community was violated because the panel from which his jury was selected contained only one African-American.

To establish a prima facie violation of the fair cross-section requirement, Petitioner must demonstrate: (1) the group alleged to be excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979); *Berghuis*, 543 F.3d at 335.

While African-Americans are a "distinctive group" in Wayne County, Petitioner's claim fails because he cannot satisfy the second or third prong of the analysis. With respect to the second prong, as the Michigan Court of Appeals correctly observed, while Petitioner established that the panel from which *his* jury was selected contained a paucity of African-Americans, Petitioner has presented no proof of "underrepresentation on Wayne County jury arrays in general." *People v. Miller,* No. 256496, Opinion at 2 (Mich. Ct. App., Oct. 18, 2005). To satisfy the second prong of the analysis, Petitioner must do more than show that African-Americans were not sufficiently represented in the single panel from which his particular jury was selected. *See, e.g., United States v. Allen*, 160 F.3d 1096, 1103 (6th Cir. 1998) (to establish a violation of the fair cross-section requirement, petitioner "must show more than that their particular panel was unrepresentative");

*United States v. Hill*, 197 F.3d 436, 445 (10th Cir. 1999) (same). Furthermore, even if Petitioner could satisfy the second prong of the analysis, as the Michigan Court of Appeals correctly concluded, Petitioner has failed to show that any underrepresentation of African-Americans in his jury array or any other Wayne County jury arrays resulted from systematic exclusion of African-Americans in the jury selection process. *People v. Miller,* No. 256496, Opinion at 2 (Mich. Ct. App., Oct. 18, 2005).

### B.    Fourteenth Amendment

Criminal defendants enjoy the constitutional right to be tried by a jury selected in conformance with the Constitution's guarantee of equal protection. *See United States v. Ovalle*, 136 F.3d 1092, 1104 (6th Cir. 1998) (citing *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)). Petitioner claims that the jury that convicted him was selected in a manner that violated his right to equal protection of the laws.

To prevail on this claim, Petitioner must establish the following: (1) the group excluded from service is a distinct class capable of being singled out for different treatment; (2) the jury selection process is susceptible to abuse or is not racially neutral; and (3) the exclusion or underrepresentation of the distinct class in question has occurred over a significant period of time. *See Ovalle*, 136 F.3d at 1104.

Again, while Petitioner can establish the first prong of the analysis he cannot satisfy the second or third prongs thereof. Petitioner has presented no evidence that the process by which his jury was selected (or the process by which any Wayne County jury was selected) was susceptible to abuse or is not racially neutral. Petitioner has likewise failed to demonstrate that African-

Americans have been excluded or underrepresented from jury service in Wayne County for a significant period of time. The Michigan Court of Appeals rejected this claim, finding that Petitioner had "failed to offer evidence of underrepresentation over a significant period or of a procedure which is susceptible of abuse or not racially neutral," but instead "merely presents evidence of the make-up of his own jury array." *People v. Miller,* No. 256496, Opinion at 2 (Mich. Ct. App., Oct. 18, 2005).

The Michigan Court of Appeals found Petitioner's fair cross-section and equal protection claims to be without merit. In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, these claims raise no issue upon which habeas relief may be granted.

## II.       Evidentiary Claims

As previously noted, Officer William Niarhos testified that he executed a search at Petitioner's residence pursuant to which he recovered more than 100 pieces of live ammunition and two large bags which contained a substance that appeared to be marijuana. (Trial Transcript, May 18, 2004, 173-75). Petitioner asserts that the admission of this evidence denied him the right to a fair trial.[1]

Generally, errors by a state court on matters involving the admission or exclusion of

---

[1]   The Court notes that the trial transcript contains no indication that the prosecution admitted (or attempted to admit) into evidence the items seized during the search of Petitioner's residence.

evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.* In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh*, 329 F.3d at 512.

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

The testimony concerning the ammunition discovered in Petitioner's residence was relevant in at least two respects. First, the existence of the ammunition tends to demonstrate that Petitioner had access to a weapon. The location of the seized ammunition was also relevant. Randall Reed testified that immediately prior to being shot, Petitioner was driving fast and erratically. Reed further testified that before being shot, Petitioner stated that "somebody shot up his people's house." Petitioner's conduct suggests that when he shot Reed and Bell, he was

hurriedly attempting to locate and extract retribution on the people that allegedly "shot up his people's house." That the ammunition recovered from Petitioner's residence was located on "the hallway floor" and the "top of the couch" suggests that Petitioner hurriedly armed himself before departing his residence, supporting this theory. As for the testimony concerning the suspected marijuana seized from Petitioner's residence, the trial court instructed the jury to disregard such testimony. (Trial Transcript, May 19, 2004, 104).

The Michigan Court of Appeals found that the admission of the testimony in question did not deprive Petitioner of a fair trial. *People v. Miller,* No. 256496, Opinion at 2-3 (Mich. Ct. App., Oct. 18, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raise no issue upon which habeas relief may be granted.

III.       **Sufficiency of the Evidence**

As previously noted, Petitioner was convicted of first degree murder, assault with intent to murder, possession of a firearm during the commission of a felony, and being a felon in possession of a firearm. Petitioner asserts that he is entitled to habeas relief because his convictions are not supported by sufficient evidence.

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the

benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect at the time of the events in question, an individual was guilty of first degree murder if the following elements were satisfied: (1) the defendant intentionally killed the victim, and (2) the killing was deliberate and premeditated. *People v. Wofford*, 492 N.W.2d 747, 749 (Mich. Ct. App. 1992). Premeditation and deliberation require "sufficient time to allow the defendant to take a second look." *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992). Premeditation and deliberation may be inferred from the circumstances surrounding the killing. Furthermore, premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties, (2) the defendant's actions before the killing, (3) the circumstances of the killing itself, and (4) the defendant's conduct after the killing. *Id.*

An individual was guilty of assault with intent to murder if the following elements were satisfied: (1) an assault; (2) with an actual intent to kill; (3) which, if successful, would make the killing murder. *People v. Davis*, 549 N.W.2d 1, 4 (Mich. Ct. App. 1996). The intent to kill "may

be proven by inference from any facts in evidence." *Id.*; *see also*, *People v. Price*, 1997 WL 33353593 at *1 (Mich. Ct. App., Mar. 7, 1997) (intent to kill may be inferred from the use of a lethal weapon or "from conduct the natural tendency of which is to cause death or great bodily harm").

An individual was guilty of possession of a firearm during the commission of a felony if he: (1) possessed a firearm; (2) during the commission of a felony. *People v. Akins*, 675 N.W.2d 863, 873 (Mich. Ct. App. 2003). An individual was guilty of being a a felon in possession of a firearm if the following elements were satisfied: (1) the defendant possessed a firearm; (2) he had been convicted of a prior specified felony; and (3) the defendant's right to possess a firearm had not yet been restored. *People v. Kincade*, 2009 WL 1101548 at *1 (Mich. Ct. App., Apr. 23, 2009).

Viewing the evidence in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of the various crimes with which he was charged. The Michigan Court of Appeals found that Petitioner's convictions were supported by sufficient evidence. *People v. Miller,* No. 256496, Opinion at 4-5 (Mich. Ct. App., Oct. 18, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raise no issue upon which habeas relief may be granted.

IV.        **Ineffective Assistance of Counsel**

Petitioner asserts that his trial attorney was ineffective for failing to present an alibi defense and failing to file a pretrial motion to suppress the identification testimony offered by

Randall Reed.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms. *Id.* at 688. In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance. Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008). This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.      Failure to File a Pretrial Motion

As previously noted, Randall Reed testified that Petitioner was the individual who shot him and Andrew Bell. Petitioner asserts that because Reed's identification testimony was tainted and unreliable, his attorney was ineffective for failing to file a pretrial motion to suppress Reed's identification testimony. Petitioner cannot establish that his attorney was ineffective for

19

failing to file such a motion. Moreover, even if the Court assumes that counsel rendered ineffective assistance, Petitioner cannot establish prejudice resulting therefrom.

At the preliminary examination, Randall Reed testified without equivocation that Petitioner was the person who shot at him and Andrew Bell. (Preliminary Examination Transcript, February 13, 2004, 7-8, 17). At trial, on direct examination, Reed again unequivocally identified Petitioner as the man who shot at him and Andrew Bell. (Trial Transcript, May 18, 2004, 34-35, 46-49). When cross-examined at trial, however, Reed testified that prior to the preliminary examination he had been shown a photograph of Petitioner. (Tr. 73-74). Reed further testified that he had not been shown photographs of anybody else and had not participated in a lineup identification procedure. (Tr. 74).

Petitioner asserts that in light of Reed's trial testimony, his attorney should have filed a pretrial motion to exclude Reed's testimony. The record, however, contains no evidence that Petitioner's attorney knew (or should have known), prior to trial, that Reed had been shown a photograph of Petitioner (and only Petitioner) prior to the preliminary examination. Stated simply, Petitioner is asking the Court to find that his attorney was ineffective for failing to predict *prior to trial* the content of Reed's subsequent trial testimony. The illogic of Petitioner's argument is apparent. The Court finds, therefore, that Petitioner has failed to demonstrate that his attorney's failure to file a pretrial motion to suppress Reed's identification testimony constituted deficient performance. However, even if such were the case the outcome would be the same because Petitioner cannot establish that he was prejudiced by his attorney's alleged shortcoming.

The due process clause protects criminal defendants from being convicted on the basis of "evidence derived from a suggestive identification procedure" that was "unnecessarily

suggestive and conducive to irreparable mistaken identification." *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)). It is the likelihood of misidentification that violates a criminal defendant's due process rights. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994) (citing *Biggers*, 409 U.S. at 198). Accordingly, absent "a very substantial likelihood of irreparable misidentification," identification evidence "is for the jury to weigh." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

      The Supreme Court has long recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Simmons v. United States*, 390 U.S. 377, 383 (1968). Despite "the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement." *Id.* at 384. The Court concluded, therefore, that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.*, *see also*, *Tipton v. Carlton*, 2008 WL 5397785 at *4 (6th Cir., Dec. 29, 2008) (same).

      To determine whether a photographic identification procedure was impermissibly suggestive, a court employs a two-step analysis. *Ledbetter*, 35 F.3d at 1070-71; *Haliym*, 492 F.3d at 704. The court must first determine whether the identification procedure in question was unduly suggestive. *Ledbetter*, 35 F.3d at 1070-71; *Haliym*, 492 F.3d at 704. Determining whether an identification procedure is unnecessarily suggestive "depends upon whether the witness's attention was directed to a suspect because of police conduct." *Howard*, 405 F.3d at 470.

If the identification procedure is found to be unnecessarily suggestive, the court must determine "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Id.* (quoting *Manson*, 432 U.S. at 107); *see also*, *Ledbetter*, 35 F.3d at 1071; *Haliym*, 492 F.3d at 704. When considering whether a suggestive identification is nonetheless reliable, the Court must consider the following factors: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Haliym*, 492 F.3d at 704 (citing *Manson*, 432 U.S. at 114 and *Neil*, 409 U.S. at 199-200).

The Michigan Court of Appeals found that "[s]howing a witness a single photo is considered a suggestive identification procedure." *People v. Miller,* No. 256496, Opinion at 4 (Mich. Ct. App., Oct. 18, 2005). The totality of circumstances, however, does not support the argument that Reed's identification of Petitioner was unreliable. At trial, Reed testified that he had a good opportunity to view Petitioner immediately prior to the shooting because Petitioner had stopped his car only "one or two feet" away from Reed's vehicle. (Trial Transcript, May 18, 2004, 48). Reed testified that during this time he had an unobstructed view into Petitioner's vehicle. (Tr. 48-49). Reed's attention was focused on Petitioner during this time, as the two were engaged in a brief conversation immediately prior to Petitioner opening fire on Reed and Bell. (Tr. 48-49). Reed was unequivocal in his assertion that Petitioner was the individual who shot at him and Andrew Bell. (Tr. 34-35, 46-49).

In sum, Petitioner cannot demonstrate that there existed any legitimate basis to prevent Randall Reed from offering identification testimony at trial. Thus, Petitioner cannot

establish that he suffered prejudice as a result of his attorney's failure to seek to prevent Reed from offering such testimony. With respect to this claim, the Michigan Court of Appeals concluded that "[a]lthough is it unclear why neither a corporeal or photographic lineup were conducted, we cannot conclude that there is a substantial likelihood that Reed misidentified defendant as the perpetrator. . .[t]herefore, defense counsel's failure to move to suppress Reed's in-court identification testimony did not constitute ineffective assistance." *People v. Miller,* No. 256496, Opinion at 4 (Mich. Ct. App., Oct. 18, 2005). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim presents no issue on which habeas relief may be granted.

### B.      Failure to Present an Alibi Defense

Petitioner asserts that his attorney was ineffective for failing "to call alibi witness Tamichia Latham to testify." Petitioner asserts that his attorney interviewed Latham, but determined that her testimony was unnecessary.

Petitioner's claim fails for at least two reasons. First, even if the Court assumes that counsel was ineffective for failing to question Latham at trial, Petitioner cannot demonstrate that he was prejudiced by such. Petitioner has presented no evidence that Latham would have offered testimony providing him with an alibi. Petitioner has submitted an affidavit executed by Lathan, however, such fails to provide Petitioner with an alibi. With respect to this issue, Latham merely asserts, "I was a witness, Tony was home with me." (Dkt. #1, App. C). While the Court does not want to appear to be unfairly scrutinizing Latham's affidavit, the fact remains that Latham has failed

to place her assertion that "Tony was home with me" in any temporal context. She has not asserted that Petitioner was with her on January 27, 2004, or even asserted that Petitioner was with her "when the crime was committed." The vague assertion that "Tony was home with me" does not constitute an alibi. Thus, Petitioner cannot demonstrate that he was prejudiced by his attorney's failure to question Tamichia Latham.

Furthermore, Petitioner concedes that his attorney made a strategic decision not to call Latham to testify, but has failed to present evidence or argument that rebuts the presumption that counsel's determination in this regard constitutes "sound trial strategy." As the Michigan Court of Appeals observed

> There are many plausible reasons for counsel's decision not to present defendant's girlfriend as his only witness and alibi evidence, including lack of credibility and a risk that the jury would focus on the strengths of the two versions of the events instead of the weaknesses in the prosecutor's case. In other words, the presentation of this extremely weak alibi evidence may have done more harm than good in this case and, thus, it was a matter of sound trial strategy not to pursue its admission. While in hindsight the strategy proved unsuccessful, this does not establish that counsel was ineffective.

*People v. Miller,* No. 256496, Opinion at 3 (Mich. Ct. App., Oct. 18, 2005).

This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Thus, this claim presents no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not

being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Miller's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  July 13, 2009                                   /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge